## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Case No. 1:15-cv-00841

| | |
|---|---|
| BREWSTER SMITH, Jr., DORIS KIROUAC, CHRISTINA HAWKS, REGINA NICKLES, DEBORAH RIGGS, and PATRICIA WELLS, individually and as representatives of a class of similarly situated persons, and on behalf of the BB&T Corporation 401(k) Savings Plan, <br><br> Plaintiffs, <br><br> v. <br><br> BB&T Corporation, BB&T Corporation Employee Benefits Plan Committee, BB&T Corporation Board of Directors, Compensation Committee of the Board of Directors of BB&T Corporation, John A. Allison, IV, Jennifer S. Banner, K. David Boyer, Jr., Anna R. Cablik, Nelle R. Chilton, Ronald E. Deal, Tom D. Efird, James A. Faulkner, Barry J. Fitzpatrick, J. Littleton Glover, Jr., L. Vincent Hackley, Jane P. Helm, I. Patricia Henry, John P. Howe, III, Eric C. Kendrick, Kelly S. King, Valeria Lynch Lee, Louis B. Lynn, James H. Maynard, Albert O. McCauley, Edward C. Milligan, J. Holmes Morrison, Charles A. Patton, Nido R. Qubein, William J. Reuter, Tollie W. Rich, Jr., E. Rhone Sasser, Christine Sears, Thomas E. Skains, Thomas N. Thompson, Edwin H. Welch, Stephen T. Williams, Steven L. Reeder, Branch Banking and Trust Company, Sterling Capital Management LLC, and John Does 1–20. <br><br> Defendants. | COMPLAINT—CLASS ACTION <br><br><br> JURY TRIAL DEMANDED |

## COMPLAINT

1.      This case arises from breaches of fiduciary duties by BB&T Corporation and its Board of Directors in the management of their employees' 401(k) plan (the BB&T Corporation 401(k) Savings Plan ("the Plan")). In the competitive marketplace for retirement plan services, multi-billion 401(k) plans such as the Plan wield tremendous bargaining leverage, and can obtain high-quality investment management and administrative services at low cost. As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of participants and without self-interest, while ensuring that the Plan's fees are reasonable. Instead of using the Plan's bargaining power to benefit employees, Defendants acted to benefit themselves by using high-cost proprietary investment funds managed by BB&T and its subsidiary and hiring BB&T itself or another BB&T subsidiary to be the plan's trustee and recordkeeper, and selecting other high-cost investment options. This allowed BB&T and its subsidiaries to collect millions of dollars in revenues, in an amount that greatly exceeded the value of the services to the Plan, thereby enriching BB&T at the expense of Plan participants. By acting for their own benefit rather than solely in the interest of Plan participants, and failing to adequately consider the use of non-proprietary products and services and other low-cost options available to the Plan, Defendants breached their fiduciary duties of loyalty and prudence, and engaged in transactions expressly prohibited by ERISA.[1] Defendants also

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

covered up their long campaign of self-interested and imprudent conduct through a series of false and misleading communications to Plan participants.

2.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of similarly situated persons, bring this action on behalf of the Plan under 29 U.S.C. §§1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan any profits made through Defendants' use of the Plan's assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

3.     This court has federal question subject matter jurisdiction under 28 U.S.C. §1331 because this is an action under 29 U.S.C. §1132(a)(2) and (3), for which federal district courts have exclusive jurisdiction under 29 U.S.C. §1132(e)(1).

4.     This district is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant resides or may be found, including BB&T Corporation, which has its headquarters in Winston-Salem, North Carolina, within this district. All Defendants are subject to nationwide service of process under 29 U.S.C. §1132(e)(2).

Case 1:15-cv-00841-CCE-JEP   Document 1   Filed 10/08/15   Page 3 of 78

## PARTIES

### BB&T Corporation 401(k) Savings Plan

5.     BB&T Corporation established and maintains the Plan for its eligible employees and is the Plan sponsor under 29 U.S.C. §1002(16)(B).

6.     As required by 29 U.S.C. §1102(a)(1), the Plan is established and maintained pursuant to a written plan document, titled "BB&T Corporation 401(k) Savings Plan."

7.     With the exception of certain employees covered by collective bargaining agreements, all employees of BB&T Corporation and certain of its affiliates are eligible to participate in the Plan.

8.     The Plan is an "employee pension benefit plan" under 29 U.S.C. §1002(2)(A), and an "individual account plan" or "defined contribution plan" under 29 U.S.C. §1002(34).

9.     The Plan was established on July 1, 1982 by a predecessor of BB&T Corporation, and was subsequently amended and restated effective January 1, 2000, January 1, 2007, and January 1, 2013.

10.     The Plan has approximately $3 billion in assets and 32,000 participants with account balances.

4

**Plaintiffs**

11.     Brewster Smith, Jr. resides in Timberlake, North Carolina, within this district. He is a "participant" in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

12.     Doris Kirouac resides in Duluth, Georgia and is a participant in the Plan because she and her beneficiaries are eligible to receive benefits under the Plan.

13.     Christina Hawks resides in Baisden, West Virginia and is a participant in the Plan because she and her beneficiaries are eligible to receive benefits under the Plan.

14.     Regina Nickles resides in Gilbert, West Virginia and is a participant in the Plan because she and her beneficiaries are eligible to receive benefits under the Plan.

15.     Deborah Riggs resides in Baisden, West Virginia and is a participant in the Plan because she and her beneficiaries are eligible to receive benefits under the Plan.

16.     Patricia Wells resides in Kingston, Tennessee and was a participant in the Plan until the second quarter of 2012, when her account balance was distributed from the Plan. Wells nonetheless is entitled to receive benefits from the Plan in the amount by which her account would have increased in value as of the time of the account distribution had Defendants not breached their duties as alleged herein or had Defendants performed their duties under 29 U.S.C. §1104(a) before that date.

**Defendants**

17.     The Defendants include both "named fiduciaries" under 29 U.S.C. §1102(a)(1), who have authority under the written plan document to control and manage

5

the administration of the plan, and functional fiduciaries under 29 U.S.C. §1002(21)(A), who possess or exercise certain types of authority, responsibility, or control over the Plan. Each Defendant is also a "party in interest" under 29 U.S.C. §1002(14).

18.    Section 10.1 of the Plan provides for five named fiduciaries under 29 U.S.C. §1102(a)(1) with joint or several authority to control and manage the operation and administration of the Plan:

a.    Section 10.1.1 names the Board of Directors of BB&T Corporation as the fiduciary responsible for appointing and removing members of the Employee Benefits Plan Committee. The Board of Directors is responsible for oversight of the Plan, including the appropriateness of the Plan's investment offerings, and monitoring of investment performance.

b.    Section 10.1.2 names the Employee Benefits Plan Committee as the fiduciary responsible for interpreting the provisions of the Plan, determining the rights of participants under the Plan, administering the Plan in accordance with its terms (except to the extent the Plan delegates such powers to another fiduciary), accounting for the interests of participants in the Plan, and directing the Trustee in the distribution of trust assets. The Employee Benefits Plan Committee consists of at least three individuals, all of whom are appointed by the Board of Directors.

c.    Section 8.1 of the Plan provides that the Chairman of the Employee Benefits Plan Committee is the Plan Administrator under 29 U.S.C.

§1002(16)(A). Under §10.1.3 of the Plan, the Plan Administrator is the fiduciary responsible for filing required reports with the United States Department of Labor, Internal Revenue Service, and other government agencies; complying with legal requirements for disclosing plan provisions and other plan-related information to participants and other interested parties; and administering claims for benefits. Since 2003, Defendant Steven L. Reeder, Senior Vice President & Benefits Manager of BB&T Corporation, has signed as "plan administrator" the Plan's annual returns/reports filed with the United States Departments of Labor and Treasury and Securities and Exchange Commission.

d.   Section 10.1.4 of the Plan provides that the Plan trustee is the fiduciary responsible for investing trust assets, making distributions to participants, rendering annual accountings to BB&T Corporation, and otherwise holding, administering, and controlling the assets of the trust as provided in the plan and trust agreement. The Plan's Trustee is BB&T Corporation or its wholly-owned subsidiary, Defendant Branch Banking and Trust Company.

e.   The Compensation Committee of the Board of Directors of BB&T Corporation is named by §10.1.5 as the fiduciary responsible for determining the investment funds to be made available to participants and adopting an investment policy statement for the Plan.

7

19.     Acting through its Board of Directors and other BB&T Corporation officers, directors, employees, agents, affiliates, subsidiaries, and committees, BB&T Corporation exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, or had discretionary authority or discretionary responsibility in the administration of the Plan by hiring and retaining itself or its subsidiary to be the Plan's recordkeeper, causing or allowing excessive compensation to be paid to the recordkeeper, selecting and retaining imprudent and unreasonably expensive plan investment options, using and retaining very short-term investments for the Plan's fixed-income options while failing to adequately investigate using a longer duration stable value fund with higher returns, as many 401(k) plans have, and structuring the BB&T Common Stock Fund as a unitized account with excessive fees, direct conflicts of interest, and mismanagement of the fund, all as described in more detail below.

20.     The Plan's financial statements filed with the United States Departments of Labor and Treasury and the Securities and Exchange Commission state that BB&T Corporation's "Trust Division" provides trustee and recordkeeping services to the Plan. Materials provided to Plan participants state that a BB&T subsidiary, Branch Banking and Trust Company, is the trustee and recordkeeper. To the extent BB&T Corporation rather than its subsidiary is the Trustee, it is a named fiduciary under 29 U.S.C. §1102(a)(1) and Plan §10.1.4. In its capacity as trustee and recordkeeper, BB&T

8

Corporation is a fiduciary to the Plan under 29 U.S.C. §1002(21)(A) because it exercised control over its own compensation from Plan assets through the actions of the Board of Directors and the named fiduciary committees in retaining BB&T Corporation as recordkeeper, selecting and retaining plan investment options that paid excessive recordkeeping fees and other compensation, and causing or allowing it to receive excessive compensation, all as described in more detail below.

21.　　Alternatively, to the extent BB&T Corporation is not a fiduciary, it is subject to appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on its knowing participation in prohibited transactions or knowing receipt of payments made in breach of the fiduciary Defendants' fiduciary duties, as described in more detail below.

22.　　The following individuals are current or former members of the Board of Directors of BB&T Corporation: John A. Allison, IV, Jennifer S. Banner, K. David Boyer, Jr., Anna R. Cablik, Nelle R. Chilton, Ronald E. Deal, Tom D. Efird, James A. Faulkner, Barry J. Fitzpatrick, J. Littleton Glover, Jr., L. Vincent Hackley, Jane P. Helm, I. Patricia Henry, John P. Howe, Eric C. Kendrick, Kelly S. King, Valeria Lynch Lee, Louis B. Lynn, James H. Maynard, Albert O. McCauley, Edward C. Milligan, J. Holmes Morrison, Charles A. Patton, Nido R. Qubein, William J. Reuter, Tollie W. Rich, Jr., E. Rhone Sasser, Christine Sears, Thomas E. Skains, Thomas N. Thompson, Edwin H. Welch, and Stephen T. Williams. By virtue of their membership on the Board of Directors, each of these individuals possessed discretionary authority and responsibility in the administration of the Plan, exercised discretionary authority or control respecting

9

management of the Plan by appointing and monitoring the members of the Employee Benefits Plan Committee, exercised authority or control respecting management or disposition of Plan assets through their actions or omissions with respect to the appropriateness of the Plan's investment offerings and monitoring of investment performance, and directly facilitated and participated in Defendant Board of Directors' breaches of fiduciary duties, all as described in more detail below. Thus, each of these individuals is a fiduciary with respect to the Plan under 29 U.S.C. §1002(21)(A).

23. The following individuals are current or former members of Compensation Committee of the Board of Directors of BB&T Corporation: Nelle R. Chilton, Ronald E. Deal, Albert O. McCauley, Tom D. Efird, Jane P. Helm, Thomas N. Thompson, Jennifer S. Banner, J. Littleton Glover, Jr., Thomas E. Skains, Anna R. Cablik, Valeria Lynch Lee, John P. Howe, III, Edward C. Milligan, Charles A. Patton, Edwin H. Welch, Tollie W. Rich, Jr., Eric C. Kendrick, and Louis B. Lynn. By virtue of their membership on the Compensation Committee, each of these individuals possessed discretionary authority and responsibility in the administration of the Plan. Through their actions and omissions with respect to determining the investment funds to be made available to participants, each of these individuals exercised discretionary authority or control respecting management of the Plan and exercised authority or control respecting management or disposition of the Plan's assets, and directly participated and facilitated Defendant Compensation Committee's breaches of fiduciary duties, all as described in more detail

10

below. Thus, each of these individuals is a fiduciary with respect to the Plan under 29 U.S.C. §1002(21)(A).

24. Reeder and the other current or former members of the Employee Benefits Plan Committee are fiduciaries of the Plan under 29 U.S.C. §1002(21)(A) because they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, or had discretionary authority or discretionary responsibility in the administration of the Plan, as described in more detail below. Because Plaintiffs are currently unaware of the identities of the individual members of the Employee Benefits Plan Committee other than Defendant Reeder, those individuals are collectively named as John Does 1– 20. Plaintiffs will substitute the real names of the John Does when they are known to Plaintiffs. To the extent the Employee Benefits Plan Committee delegated any of its fiduciary functions to another person or entity, the nature and extent of which has not been disclosed to Plaintiffs, the person or entity to which the function was delegated is also a fiduciary under 29 U.S.C. §1002(21)(A) for the same reasons.

25. Branch Banking and Trust Company is a wholly-owned subsidiary of BB&T Corporation, and is the Plan's trustee and recordkeeper. Under Plan §1.33, it is a "Participating Employer" whose employees participate in the Plan. Thus, it is a "party in interest" under 29 U.S.C. §1002(14)—which is defined to encompass those entities that a fiduciary might be inclined to favor at the expense of the plan's participants—because it provides services to the Plan and its employees are covered by the Plan. As Trustee, it is

11

a named fiduciary under 29 U.S.C. §1102(a)(1) and Plan §10.1.4. Under 29 U.S.C. §1002(21)(A), it is a fiduciary to the Plan because it exercised control over the amount of revenue sharing payments it received from the Plan, as described in more detail below. Alternatively, to the extent it is not a fiduciary, it is subject to appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on its knowing participation in prohibited transactions or knowing receipt of payments made in breach of the fiduciary Defendants' fiduciary duties.

26.     Sterling Capital Management, LLC is a wholly-owned subsidiary of BB&T Corporation and serves as the investment adviser of several of the Plan's mutual funds. Under Plan §1.33, it is a "Participating Employer" whose employees participate in the Plan. Thus, it is a "party in interest" under 29 U.S.C. §1002(14) because it provides services to the Plan and its employees are covered by the Plan. Under 29 U.S.C. §1002(21)(A), it is a fiduciary to the Plan because it exercised control over the amount that the recordkeeper and trustee was paid from Plan assets, all as described in more detail below. Alternatively, to the extent it is not a fiduciary, it is subject to appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on its knowing participation in prohibited transactions or knowing receipt of payments made in breach of the fiduciary Defendants' fiduciary duties.

Case 1:15-cv-00841-CCE-JEP   Document 1   Filed 10/08/15   Page 12 of 78

## FACTS APPLICABLE TO ALL COUNTS

### Proprietary Investment Funds

27.     In a defined-contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan, less expenses. See 29 U.S.C. §1002(34). Accordingly, poor investment performance and excessive fees can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. See, e.g., U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013) (illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).

28.     Here, BB&T's Board of Directors and the Board's Compensation Committee (and BB&T Corporation acting through these entities), and the Employee Benefits Plan Committee controlled the available investments in which the participants would place their retirement assets. Despite the many high-quality and low-cost investment options available in the market, the Plan's investment options have contained many of BB&T's own proprietary mutual funds. These Defendants chose the BB&T funds not based on their merits as investments, or because doing so was in the interest of Plan participants, but because these products provided significant revenues and profits to BB&T Corporation and its subsidiaries.

13

29.     Prior to October 1, 2010, the proprietary options in the Plan were managed by BB&T Asset Management, Inc., a wholly-owned subsidiary of BB&T Corporation, and were branded as "BB&T" funds. On October 1, 2010, BB&T Asset Management merged into Sterling Capital Management, LLC, another wholly-owned subsidiary of BB&T Corporation. Effective February 1, 2011, the BB&T funds were renamed "Sterling Capital" funds, but remained BB&T proprietary funds.

30.     As of January 1, 2007, the date of the previous restatement of the Plan and the proposed starting date for Plaintiffs' class, the Plan's designated investment options were exclusively proprietary options, including 16 BB&T mutual funds, the BB&T Common Stock Fund, and the BB&T One-Year Bank Investment Contract.[2]

31.     The Plan did not include any non-proprietary funds among the designated options until 2009. At that time, the Plan continued to include eight BB&T mutual funds, along with the proprietary BB&T Common Stock Fund and One-Year Bank Investment Contract. The total annual operating expense or "expense ratio" of the eight BB&T

---

[2] The Plan also offered a self-directed brokerage option, through which participants can invest in various mutual funds and stocks that have not been screened by a fiduciary and have not been designated for inclusion on the core investment menu. BB&T represents that it "does not monitor these investments … and it is up to you to determine if these options are suitable for your retirement." As of 2007, only about 1.5% of the Plan's assets were invested in the brokerage option. The investments available through the brokerage option are mostly retail mutual funds, and any participant using the option must sign a brokerage account contract and agree to pay a number of additional fees, including brokerage commissions, transaction fees of up to $25 for each trade, account maintenance fees of $50 per year, and various miscellaneous charges.

Case 1:15-cv-00841-CCE-JEP   Document 1   Filed 10/08/15   Page 14 of 78

mutual funds ranged between 72 basis points to 153 basis points (100 basis points = 1%), far beyond fees readily-available to 401(k) plans even much smaller than the Plan:

      A.      BB&T International Equity Fund: 153 basis points;

      B.      BB&T Small Cap Value Fund: 116 basis points;

      C.      BB&T Special Opportunities Fund: 107 basis points;

      D.      BB&T Mid Cap Growth Fund: 98 basis points;

      E.      BB&T Equity Income Fund: 97 basis points;

      F.      BB&T Mid Cap Value Fund: 95 basis points;

      G.      BB&T Large Company Value Fund (later known as Select Equity Fund): 83 basis points;

      H.      BB&T Total Return Bond Fund: 72 basis points.

32.      Two of those funds are no longer in the Plan because they went out of business: the BB&T Mid Cap Growth Fund was merged into the BB&T Mid Cap Value Fund on February 1, 2010, and the BB&T International Equity Fund was liquidated on January 31, 2012.

33.      Currently, the Plan's designated investment options continue to include six proprietary Sterling Capital mutual funds, with expense ratios ranging from 85 to 103 basis points for equity funds and 59 basis points for the bond fund, far beyond the fees readily available to 401(k) plans even much smaller than the Plan:

      A.      Sterling Capital Small Cap Value Fund: 103 basis points;

      B.      Sterling Capital Special Opportunities Fund: 99 basis points;

      C.      Sterling Capital Equity Income Fund: 97 basis points;

15

D.    Sterling Capital Mid Cap Value Fund: 93 basis points;

E.    Sterling Capital Large Cap Value Diversified Fund (formerly known as Select Equity Fund): 85 basis points;

F.    Sterling Capital Total Return Bond Fund: 59 basis points.

34.    As of December 31, 2014, the Plan had over $1 billion invested in these proprietary mutual funds. In prior years the plan had similar totals: 2013—$974 million; 2012—$790 million; 2011—$716 million; 2010—$726 million; 2009—$591 million.[3]

35.    In addition to the proprietary mutual funds, Defendants continue to provide as Plan investments two other proprietary non-mutual fund options: the BB&T Common Stock Fund, the largest Plan option, with over $614 million as of December 31, 2014, and the BB&T Associate Insured Deposit Account (which replaced the BB&T One-Year Bank Investment Contract in 2012), which held $172 million at year-end 2014.

36.    Accordingly, as of December 31, 2014, $1.84 billion of the Plan's $2.93 billion in assets—*63%*—was invested in proprietary BB&T options.

37.    Until 2009, Defendants provided participants only proprietary options. To the extent non-proprietary options have been added, they have generally covered different investment styles than the remaining proprietary options, so participants seeking to invest in styles for which the Plan offered only proprietary funds had no means to avoid the proprietary option. Moreover, while the number of available proprietary options has been

---

[3] The figures for 2011 and 2010 include assets in the BB&T International Fund, which was removed from the Plan in 2012; 2009 includes both the International Fund and the BB&T Mid Cap Growth Fund, which merged into the Mid Cap Value Fund in 2010.

16

reduced over time, the proprietary equity funds that were removed had relatively small asset levels compared to the proprietary funds retained in the plan, so the amount of assets invested in the proprietary options has remained high—currently almost two-thirds of the entire Plan. As of year-end 2006, the Plan had about $1.75 billion invested in proprietary funds, similar to the current amount. Accordingly, the asset base from which BB&T and its subsidiaries derive revenues from employees' investments in proprietary funds continues to represent most of the Plan's assets, despite the reduction in the number of proprietary funds.

### Proprietary Recordkeeping

38.     Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping is highly competitive. There are numerous vendors in the marketplace who are equally capable of providing a high level of service to a large 401(k) plan like the Plan and will readily respond to a request for proposals. These vendors primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

39.     Rather than using an arm's length bidding process to hire a recordkeeper, since 2000, Defendants have used BB&T Corporation's Trust Division or BB&T's subsidiary Branch Banking and Trust Company as the Plan's trustee and recordkeeper.

40.     Defendants used BB&T or its subsidiary to provide these services without any competitive bidding process and without any negotiation over the compensation to be paid for these services, even though other entities could have provided the same services

17

at a far lower cost to the Plan. This allowed BB&T or its subsidiary to receive significant revenues and profits, which came at the direct expense of Plan participants.

41.     As described below, by favoring proprietary options and services and other imprudent and disloyal conduct in managing the Plan, Defendants generated profits for BB&T Corporation and its subsidiaries while the Plan suffered losses due to excessive administrative and investment management fees and poor performance.

### Excessive Administrative Fees

42.     To ensure that plan administrative expenses are reasonable, prudent fiduciaries of large 401(k) plans such as the Plan put plan recordkeeping and administrative services out for competitive bidding at regular intervals of around 3 years.

43.     The cost of providing recordkeeping services depends on the number of participants, not on the amount of money in participants' accounts. The cost of providing recordkeeping services to a participant with $100,000 in her retirement account is the same as for a participant with $1,000 in her retirement account.

44.     For this reason, prudent fiduciaries set recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan, instead of a percentage of plan assets. Otherwise, as plan assets increase (such as through participant contributions and gain on investments), recordkeeping compensation increases without any change in recordkeeping services.

45.     Some mutual funds engage in a practice known as "revenue sharing." In a revenue sharing arrangement, a mutual fund takes a portion of the expense ratio it

18

charges investors and pays it to the plan's recordkeeper. Here, rather than payments to an independent recordkeeper, the revenue sharing payments were made from one BB&T entity to another.

46.    While revenue sharing payments are ostensibly provided as compensation to the recordkeeper for providing administrative services, the payments can effectively be "kickbacks" for including the fund in a plan's investment lineup. Certain vendors of recordkeeping services also sell investment products and recommend that plan fiduciaries use such affiliated funds or other funds offering revenue sharing arrangements that are favorable to the recordkeeper. Other vendors do recordkeeping only and do not sell investment products. These vendors are more likely to offer pricing on a pure per-participant basis, without any revenue sharing component.

47.    In order to make an informed assessment as to whether a recordkeeper is receiving no more than a reasonable fee for the services provided to a plan, the responsible fiduciary must identify *all* fees, including recordkeeping fees and other sources of compensation, paid to the service provider. To the extent that a plan's investment options pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan. Here, since the BB&T Plan fiduciaries must monitor the BB&T recordkeeping entity's fees, there is a direct conflict of interest.

19

48.     Here, the Plan's fees became excessive in part because Defendants failed to monitor and control the amount of the revenue sharing payments to BB&T or its subsidiary.

49.     Further, Defendants explicitly told participants that BB&T Corporation "pays the administration fees for the Plan." In fact, the Plan participants pay the vast majority of these fees through revenue sharing paid from their investments in the Plan's mutual funds, which are kicked back to the BB&T recordkeeping entity. According to the Plan's annual reports filed with the United States Departments of Labor and Treasury, BB&T or its subsidiary received indirect compensation from all of the Plan's mutual funds, including the non-proprietary funds. These payments directly reduced the retirement assets in Plan participants' accounts.

50.     For purposes of a plan's annual report, revenue sharing payments are classified as "indirect compensation," as distinguished from "direct" payments from the Plan. Instead of being flat fees per participant, the revenue sharing payments are asset-based, meaning they are assessed as a percentage of the assets Plan participants have invested in each investment option each year. In the Plan's annual reports, BB&T reported that it or its subsidiary received indirect compensation from the Plan's mutual funds at the following rates, applied to the amount of the Plan's investment in each fund:

| Fund name | Rate of indirect compensation |
|---|---|
| Sterling Capital International Fund | 85 basis points |

20

| Fund name | Rate of indirect compensation |
|---|---|
| Sterling Capital Small Cap Fund | 80 basis points |
| Sterling Capital Special Opportunities Fund | 80 basis points |
| Sterling Capital Mid Value Fund | 70 basis points |
| BB&T Mid Cap Growth Fund | 70 basis points |
| Sterling Capital Equity Income Fund | 70 basis points |
| Sterling Capital Select Equity Fund / Lg Cap Value | 60 basis points |
| Sterling Capital Total Return Bond Fund | 45 basis points |
| Fidelity Contrafund | 25 basis points |
| Brandywine Blue Fund | 15 basis points |
| T. Rowe Price Mid Cap Growth Fund | 15 basis points |
| T. Rowe Price target date funds (Retirement Income Fund and 11 funds dated 2005 through 2055) | 15 basis points |
| Harbor International Fund | 10 basis points |

51.    As this chart shows, the level of revenue sharing that BB&T Corporation or

its subsidiary received from the proprietary BB&T and Sterling Capital mutual funds was

not only asset-based instead of a flat fee per participant, but also several orders of

magnitude higher than the revenue sharing from the non-proprietary options. Defendants selected and retained the proprietary BB&T and Sterling Capital mutual funds in part because of this revenue sharing system, driving revenue to their in-house recordkeeper, and exceeding by orders of magnitude the level of reasonable fees.

52.     Based on these revenue sharing rates shown on the annual reports, and the amount of reported direct compensation from the Plan, BB&T or its subsidiary received the following approximate amounts of combined direct and indirect compensation for recordkeeping from 2009 through 2013: 2009—$3.6 million; 2010—$5.4 million; 2011—$5.3 million; 2012—$5.9 million; 2013—$2.8 million. (The 2014 annual report is not yet available).

53.     Moreover, the annual reports fail to disclose several additional sources of revenue received by BB&T or its subsidiary, including: float revenue, finders' fees, non-monetary gifts or sponsorships, and revenue paid to BB&T or its subsidiary by ProNvest, an investment advice service in the Plan which paid BB&T or its subsidiary a portion of its fees (60 to 100 basis points). The amounts of these undisclosed payments are currently not capable of precise determination from documents Defendants have filed with the Department of Labor or issued to participants, but only increase the already excessive amounts disclosed on the annual reports.

54.     Based on information currently available to Plaintiffs regarding the Plan's features, the nature of the administrative services provided by BB&T or its subsidiary, and the Plan's participant level (roughly 30,000), and the recordkeeping market, the

22

outside limit of a reasonable recordkeeping fee for the Plan would have been $30 per participant. Based on the direct and indirect compensation levels shown on the Plan's annual reports, the Plan paid approximately *$90 to $190* per participant per year from 2009 through 2013, up to *633% higher* than a reasonable fee for these services.

55.     From the beginning of 2009 to year-end 2014, the Plan's assets more than doubled, from $1.4 billion to over $2.9 billion. By year-end 2012, the Plan's assets had increased 57% percent compared to the beginning of 2009, to $2.2 billion. Because the revenue sharing payments are asset-based, the already excessive compensation paid to BB&T or its subsidiary each year from 2010 through 2012 *skyrocketed by over 50%* compared to 2009—about $2 million more per year—even though the administrative services that BB&T or its subsidiary provided to the Plan remained the same. Defendants could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plan.

56.     Based on these facts, Defendants failed to prudently monitor and control BB&T's recordkeeping compensation, particularly the amount of asset-based, uncapped revenue sharing received by BB&T or its subsidiary. By allowing BB&T or its subsidiary to receive an uncapped amount of revenue sharing, Defendants allowed BB&T or its subsidiary to receive excessive compensation for the same level of service.

57.     Moreover, had Defendants conducted a competitive bidding process for the Plan's recordkeeping services, the market would have determined a reasonable recordkeeping fee for the Plan. Had Defendants done so, they would have seen that the

23

amount the Plan was paying to BB&T or its subsidiary was greatly excessive. That would have allowed Defendants to negotiate a reduction in recordkeeping fees, either with BB&T or its subsidiary, or to retain a new recordkeeper. At that point, even if the Plan continued to use revenue sharing to pay for recordkeeping, the amount of revenue sharing could have been capped at a reasonable level, with any excess returned to the Plan.

58.    Defendants' failure to obtain competitive bids, while allowing BB&T to receive an uncapped amount of revenue sharing, resulted in the Plan paying millions of dollars in excessive fees for recordkeeping.

**Excessive Investment Management Fees and Performance Losses**

*A. Excessive fees compared to other mutual funds*

59.    At all times relevant, the Plan's investment options charged unreasonable fees for the services provided to the Plan. In 2009, the proprietary BB&T equity mutual funds charged 83 to 153 basis points, and the BB&T bond fund charged 72 basis points. See ¶31, *supra*. The fees currently disclosed to participants show that the proprietary Sterling Capital equity mutual funds charge 85 to 103 basis points, while the Sterling Capital bond fund charges 59 basis points. See ¶33, *supra*. These are far higher than reasonable investment management fees for such funds. The fees in many of the non-proprietary options have also been excessive. The fees in the Plan's mutual funds were and are significantly higher than comparable institutional investments available to 401(k) plans. The fees, moreover, are and were significantly higher than the fees available from alternative mutual funds, including Vanguard institutional funds with similar investment

24

styles that were readily available as Plan investment options. The fees for the Plan's
investment options were up to *14 times more expensive* than available Vanguard
alternatives in the same investment style:

| Fund in Plan | Exp. ratio | Vanguard alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Brandywine Blue Fund (BLUEX) | 119 bps | Vanguard Growth Index Instl (VIGIX) | 8 bps | Large Growth | 1488% |
| Sterling Capital Small Cap (SPSCX) | 103 bps | Vanguard Small-Cap Value Index Instl (VSIIX) | 8 bps | Small Value | 1288% |
| Sterling Capital Special Opportunities (BOPIX) | 99 bps | Vanguard Growth Index Instl (VIGIX) | 8 bps | Large Growth | 1238% |
| Sterling Capital Total Return Bond (BIBTX) | 59 bps | Vanguard Intermediate-Term Bond Index Instl Plus (VBIUX) | 5 bps | Intermediate Term Bond | 1180% |
| Sterling Capital International (BBTIX) | 116 bps | Vanguard Total Int'l Stock Index Instl Plus (VTPSX) | 10 bps | Foreign Large Blend | 1160% |
| Sterling Capital Equity Income (BEGIX) | 97 bps | Vanguard Value Index Admiral (VVIAX) | 9 bps | Large Value | 1078% |
| Sterling Capital Select Equity/Lg. Cap (BBISX) | 85 bps | Vanguard Value Index Admiral (VVIAX) | 9 bps | Large Value | 944% |
| Fidelity Contrafund (FCNTX) | 67 bps | Vanguard Growth Index Instl (VIGIX) | 8 bps | Large Growth | 838% |

| Fund in Plan | Exp. ratio | Vanguard alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Harbor International (HAINX) | 74 bps | Vanguard European Stock Index Admiral (VEUSX) | 12 bps | Foreign Large Blend | 617% |
| BB&T Mid Cap Growth (OCAAX) | 99 bps | Vanguard Mid-Cap Growth Index Admiral (VMGIX) | 23 bps | Mid Growth | 430% |
| T.Rowe Price Retirement 2030 (TRRCX) | 73 bps | Vanguard Target Retirement 2030 Fund Inv. (VTHRX) | 17 bps | TDF Large Blend | 429% |
| T.Rowe Price Retirement 2040 (TRRDX) | 76 bps | Vanguard Target Retirement 2040 Fund Inv. (VFORX) | 18 bps | TDF Large Blend | 422% |
| T.Rowe Price Retirement 2045 (TRRKX) | 76 bps | Vanguard Target Retirement 2045 Fund Inv. (VTIVX) | 18 bps | TDF Large Blend | 422% |
| T.Rowe Price Retirement 2050 (TRRMX) | 76 bps | Vanguard Target Retirement 2050 Fund Inv. (VFIFX) | 18 bps | TDF Large Blend | 422% |
| T.Rowe Price Retirement 2055 (TRRNX) | 76 bps | Vanguard Target Retirement 2055 Fund Inv. (VFFVX) | 18 bps | TDF Large Blend | 422% |
| T.Rowe Price Retirement 2020 (TRRBX) | 67 bps | Vanguard Target Retirement 2020 Fund Inv. (VTWNX) | 16 bps | TDF Large Blend | 419% |
| T.Rowe Price Retirement 2035 (TRRJX) | 75 bps | Vanguard Target Retirement 2035 Fund Inv. (VTTHX) | 18 bps | TDF Large Blend | 417% |

| Fund in Plan | Exp. ratio | Vanguard alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| T.Rowe Price Retirement 2025 (TRRHX) | 70 bps | Vanguard Target Retirement 2025 Fund Inv. (VTTVX) | 17 bps | TDF Large Blend | 412% |
| T.Rowe Price Retirement 2015 (TRRGX) | 63 bps | Vanguard Target Retirement 2015 Fund Inv. (VTXVX) | 16 bps | TDF Large Blend | 394% |
| T.Rowe Price Retirement 2010 (TRRAX) | 59 bps | Vanguard Target Retirement 2010 Fund Inv. (VTENX) | 16 bps | TDF Large Blend | 369% |
| T.Rowe Price Retirement 2005 (TRRFX) | 59 bps | Vanguard Target Retirement Income Fund Inv. (VTINX) | 16 bps | Retirement Income Large Blend | 369% |
| T. Rowe Price Retirement Income (TRRIX) | 57 bps | Vanguard Target Retirement Income Fund Inv. (VTINX) | 16 bps | Retirement Income Large Blend | 356% |
| T. Rowe Price Mid Cap Growth (RPMGX) | 78 bps | Vanguard Mid-Cap Growth Index Investor (VMGIX) | 23 bps | Mid Growth | 339% |
| Sterling Capital Mid Value (OVEIX) | 93 bps | Vanguard Selected Value Fund Investor (VASVX) | 44 bps | Mid Value | 211% |
| Vanguard Instl Index Instl (VINIX) | 4 bps | Vanguard Instl Index Instl Plus (VIIIX) | 2 bps | Large Blend | 200% |
| Federated Investors Treas. Obligations (TOIXX) | 20 bps | Vanguard Prime Money Market Investor (VMMXX) | 14 bps | U.S. Money Market | 143% |

| Fund in Plan | Exp. ratio | Vanguard alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Vanguard Total Int'l Stock Index I (VTSNX) | 12 bps | Vanguard Total Int'l Stock Index Instl Plus (VTPSX) | 10 bps | Foreign Large Blend | 120% |

60. Defendants also failed to use the lowest cost share class of certain mutual funds in the Plan, which would have provided an identical, but less expensive version of the exact same investment with the identical manager and an identical mix of identical investments:

a. Defendants included the retail version of the Fidelity Contrafund, (FCNTX), which charges 67 basis points, 24% higher than the 54 basis point Class K shares (FCNKX). There is no purchase minimum for Class K shares.

b. Defendants used the Vanguard Institutional Index Fund institutional share class (VINIX), which at 4 basis points is double the cost of the 2 basis point institutional plus share class (VIIIX). Although the Plan's current $137 million investment is less than the required minimum for the institutional plus shares of $200 million, mutual funds regularly waive these minimums for large 401(k) plans if the fiduciary requests a waiver. Prudent fiduciaries seeking to benefit their plans by reducing expenses regularly request such waivers. Upon information and belief, Defendants failed to request such a waiver.

### B. Excessive fees compared to separate accounts

61.     Aside from excessive fees compared to other mutual funds that were available to the Plan, Defendants also failed to adequately investigate non-mutual fund alternatives, such as collective trusts and separately managed accounts. Each mutual fund in the Plan charged fees greatly in excess of what the Plan could have obtained by purchasing these comparable products. According to the United States Department of Labor, separate accounts, which require a minimum investment of $15 million to $25 million per account, are available to "large plans … with total assets of over $500 million[.]" *Study of 401(k) Plan Fees and Expenses*, April 13, 1998. By using separate accounts, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds." *Id*. As the BB&T Plan had assets of well over $1 billion at all relevant times, separate accounts would have been readily available.

62.     Separate accounts have a number of advantages over mutual funds, including the ability to negotiate fees, and greater control by the plan sponsor over the investment guidelines. In a mutual fund, all investors are charged the same fee, and investors have no ability to modify the fund's investment guidelines, which are set by the fund's investment adviser. In a separate account, the plan sponsor can negotiate the best possible fee for the plan, and can tailor the investment guidelines to better fit the demographics of the workforce.

Case 1:15-cv-00841-CCE-JEP   Document 1   Filed 10/08/15   Page 29 of 78

63.     While certain of the Plan's options were institutional *mutual fund* shares, they did not capture the far lower expenses available given the size of the Plan's investment in each fund. Each of the Plan's mutual funds also had a retail share class. Had the Plan obtained separate accounts with expenses of one-fourth the costs of the retail shares, the Plan's expenses would have been reduced dramatically:

| Retail share of Plan fund | Retail exp. ratio | DOL rate: 1/4 of the cost of retail | Exp. ratio of Plan's share class | % fee excess over DOL rate |
|---|---|---|---|---|
| Sterling Capital International Fund (BIQAX) | 141 bps | 35 bps | 116 bps | 331% |
| Sterling Capital Small Cap Value Equity Fund Class A (SPSAX) | 124 bps | 31 bps | 103 bps | 332% |
| BB&T Mid Cap Growth Fund (OVCBX) | 123 bps | 31 bps | 99 bps | 319% |
| Sterling Capital Special Opportunities Fund Class A (BOPAX) | 121 bps | 30 bps | 99 bps | 330% |
| Sterling Capital Mid Value Fund Class A (OVEAX) | 118 bps | 30 bps | 93 bps | 310% |
| Sterling Capital Equity Income Fund Class A (BAEIX) | 120 bps | 30 bps | 97 bps | 323% |

| Retail share of Plan fund | Retail exp. ratio | DOL rate: 1/4 of the cost of retail | Exp. ratio of Plan's share class | % fee excess over DOL rate |
|---|---|---|---|---|
| Brandywine Blue Fund (BLUEX) | 119 bps | 30 bps | 119 bps | 397% |
| Harbor International Fund Investor (HIINX) | 110 bps | 28 bps | 74 bps | 264% |
| Sterling Capital Behavioral Large Cap Value Equity Fund A (BBTGX) | 106 bps | 27 bps | 85 bps | 315% |
| T. Rowe Price Mid-Cap Growth Fund Advisor Class (PAMCX) | 103 bps | 26 bps | 78 bps | 300% |
| T. Rowe Price Retirement Target Date Fund Series, Advisor (2005–2055) | 84–101 bps | 21–25 bps | 59–76 bps | 281%–304% |
| T. Rowe Price Retirement Balanced Fund Advisor Class (PARIX) | 82 bps | 21 bps | 57 bps | 271% |
| Sterling Capital Total Return Bond Fund Class A (BICAX) | 81 bps | 20 bps | 59 bps | 295% |
| Fidelity Contrafund (FCNTX) | 67 bps | 17 bps | 67 bps | 394% |

64.     Sterling Capital Management LLC itself offered its other institutional clients separately-managed accounts in the same investment styles as the Plan's proprietary mutual funds, but at much lower cost. Sterling Capital's advertising materials state that the minimum investment for these separate accounts is $10 million, with fee schedules that decline as assets increase. The Plan's investments in the Sterling Capital mutual funds are far above that threshold—five of the six options have at least $150–$200 million invested, and the remaining option has $65 million.

65.     Sterling Capital's advertised fee schedule for a Large Cap Value separate account starts at 60 basis points, and declines to 40 basis points on incremental assets over $50 million. Based on the Plan's $228 million investment in the Sterling Capital Large Cap Value Diversified mutual fund (a.k.a. Select Equity Fund), the Plan would have paid only 43 basis points under the separate account fee schedule. Thus, Defendants could have cut the 85 basis point mutual fund fee in half simply by converting the mutual fund to a separate account. Based on the advertised fee schedules, Defendants could have obtained similar savings for each of the other Sterling Capital mutual funds in the Plan. Doing so would have reduced the revenue to BB&T and its subsidiaries, and reduced participants' losses of retirement assets due to excessive fees.

66.     Aside from Sterling Capital, many other investment managers, including those that managed the Plan's non-proprietary mutual fund options, also offered separate account versions of their mutual funds with the same manager at a much lower cost than the fees paid by mutual fund investors.

67.     Moreover, unlike mutual funds, which by law must charge the same fee to all investors, separate account fee schedules are subject to negotiation. Indeed, industry data show that actual fee schedules are typically lower than advertised fee schedules, particularly when a plan has a large amount of assets to invest, as the Plan did here. Accordingly, the fee savings that Defendants could have obtained for the Plan were even greater than the amounts reflected in the investment managers' advertised fee schedules. By using almost exclusively mutual funds, Defendants squandered the ability to negotiate lower fees for the benefit of the Plan.

### C. Excessive fees compared to collective trusts

68.     Collective trusts also would have provided much lower investment management fees than the Plan's mutual funds. Collective trusts are a common investment vehicle in large 401(k) plans, and are accessible even to midsize plans with $100 million in assets or more. Anne Tergesen, *401(k)s Take a New Tack*, WALL ST. J. (Sept. 25, 2015), available at http://www.wsj.com/articles/some-funds-in-your-401-k-arent-really-mutual-funds-after-all-1443173400. According to investment consulting firm Callan Associates Inc., for plans with over $1 billion in assets, collective trusts charge an average of 54 basis points, compared to an average of 101 basis points for retail mutual funds, and 85 basis points for institutional mutual fund shares. Twenty-four of the 27 mutual funds that have been in the Plan had expense ratios far in excess of the average collective trust rate:

33

| Fund in Plan | Expense ratio | % excess over collective trust avg. (54 bps) |
|---|---|---|
| Brandywine Blue Fund (BLUEX) | 119 bps | 220% |
| Sterling Capital International (BBTIX) | 116 bps | 215% |
| Sterling Capital Small Cap (SPSCX) | 103 bps | 191% |
| BB&T Mid Cap Growth (OCAAX) | 99 bps | 183% |
| Sterling Capital Special Opportunities (BOPIX) | 99 bps | 183% |
| Sterling Capital Equity Income (BEGIX) | 97 bps | 180% |
| Sterling Capital Mid Cap Value (OVEIX) | 93 bps | 172% |
| Sterling Capital Select Equity/Lg. Cap (BBISX) | 85 bps | 157% |
| Sterling Capital Total Return Bond (BIBTX) | 59 bps | 109% |
| T. Rowe Price Mid Cap Growth (RPMGX) | 78 bps | 144% |
| Harbor International (HAINX) | 74 bps | 137% |
| Fidelity Contrafund (FCNTX) | 67 bps | 124% |
| T.Rowe Price Retirement 2055 (TRRNX) | 76 bps | 141% |

34

| Fund in Plan | Expense ratio | % excess over collective trust avg. (54 bps) |
|---|---|---|
| T.Rowe Price Retirement 2050 (TRRMX) | 76 bps | 141% |
| T.Rowe Price Retirement 2045 (TRRKX) | 76 bps | 141% |
| T.Rowe Price Retirement 2040 (TRRDX) | 76 bps | 141% |
| T.Rowe Price Retirement 2035 (TRRJX) | 75 bps | 139% |
| T.Rowe Price Retirement 2030 (TRRCX) | 73 bps | 135% |
| T.Rowe Price Retirement 2025 (TRRHX) | 70 bps | 156% |
| T.Rowe Price Retirement 2020 (TRRBX) | 67 bps | 124% |
| T.Rowe Price Retirement 2015 (TRRGX) | 63 bps | 117% |
| T.Rowe Price Retirement 2010 (TRRAX) | 59 bps | 109% |
| T.Rowe Price Retirement 2005 (TRRFX) | 59 bps | 109% |
| T.Rowe Price Retirement Income (TRRIX) | 57 bps | 106% |

69.     The Plan's "target date funds" demonstrate the fee savings available through collective trusts. Since 2009, the Plan has included a series of "target date funds," in which each fund has a "target" retirement date and changes its asset allocation

35

to become more conservative as the target date approaches. Until the end of 2014, Defendants used mutual funds managed by T. Rowe Price for the target date option, which charged up to 76 basis points. As of January 2, 2015, Defendants replaced the mutual funds with collective trust versions of the T. Rowe Price target date funds. Each of the collective trusts charges 49 basis points, meaning the mutual fund versions were up to 55% more expensive.

70.     Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, and negotiated the best possible price for the Plan. By failing to adequately investigate the use of these institutional alternatives, failing to try to obtain reduced fees for the Plan, and foregoing these alternatives without any prudent or loyal reason to do so while maintaining high-cost mutual funds that generated revenue for BB&T Corporation and its subsidiaries, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

### D. Defendants retained poorly performing funds

71.     The high fees were not justified by superior investment performance. Defendants retained proprietary funds in the Plan that consistently and historically underperformed, further demonstrating that the reason the funds were retained in the Plan was to maintain the revenue stream to BB&T Corporation and its subsidiaries from the excess fees charged by the funds.

72.     The Plan's most expensive option through January 2012 was the BB&T and Sterling Capital International Fund, which paid BB&T and Sterling Capital over 150

basis points. As of December 31, 2010, the fund had been underperforming its benchmark for years according to its prospectus, trailing its index by an average of approximately 5%—500 basis points—per year over one, five, and ten-years. Not only did Defendants place the fund in the Plan lineup, but they also failed to prudently monitor its performance, and retained it in the Plan despite its many years of abysmal performance. The Plan was one of the last investors in the fund, as Defendants retained it in the Plan until the fund was closed and liquidated on January 31, 2012.

73. The Sterling Capital Select Equity Fund (a.k.a. Sterling Capital Large Cap Value Fund), also consistently underperformed its appropriate benchmarks. This fund paid BB&T and Sterling Capital over 80 basis points to attempt to outperform a market index through "active" management, yet the fund consistently underperformed the S&P 500 Index and the Russell 1000 Value Index, appropriate benchmarks for large cap value funds. As of December 31, 2010, the Sterling Capital Select Equity Fund had significantly underperformed these indices, by 300–400 basis points over a one-year period, and an average of 200–300 basis points over a five-year period. Based on this long history of underperformance, a prudent fiduciary acting in the interests of plan participants would have removed the Select Equity Fund at least by 2010, if not sooner, based on the poor performance in previous years. Instead, Defendants kept the fund in the Plan, as the Plan's largest mutual fund at $167 million, continuing to provide a steady stream of 85 basis points in revenue to BB&T Corporation and its subsidiaries. Defendants' retention of the Select Equity Fund caused the Plan continued losses due to

37

poor performance, as the fund continued to significantly underperform its benchmarks over the next three years, a predictable result given its track record.

**Defendants included short-term, minimal return fixed income options while failing to offer a longer duration stable value fund**

74.     Stable value funds are a common investment in 401(k) plans. Stable value funds provide preservation of principal. And "[b]ecause they hold longer-duration instruments, SVFs generally outperform money market funds, which invest exclusively in short-term securities." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); see also Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market*, 39 AKRON L. REV. 9, 20–27 (2006). Indeed, even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]" Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009), available at http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf. Many large 401(k) plans have stable value funds.

75.     Until 2012, the plan did not offer a stable value fund. Instead, the Plan included two short-duration fixed income options which Defendants knew would not provide a meaningful long-term retirement asset because of below-inflation returns of under 1% per year: (1) the proprietary BB&T One-Year Bank Investment Contract (replaced in 2012 by the BB&T Corporation Associate Insured Deposit Account), which

38

provides an investment in a BB&T "business savings deposit account," and (2) the Federated Investors Treasury Obligations Fund, a money market mutual fund.

76. Since 2010, the proprietary One-Year Bank Investment Contract/Associated Insured Deposit Account returned between 0.62% and 0.77%—less than one percent per year.

77. For the last four years, the Federated Investors Treasury Obligations Fund returned 0.01%—one one-hundredth of one percent—per year. The year before that, in 2010, the return was 0.02%—two one-hundredths of one percent.

78. For five of the last six years, these two options did not even keep up with the rate of inflation. This was expected because these funds, in contrast with stable value funds, use very short-duration investment vehicles, such as short-term U.S. Treasury notes, which provide minimal returns. Given the expected returns of money market funds and similar short-term investments, a prudent fiduciary would have known that the One-Year Bank Investment Contract and Treasury Obligations Fund would not provide participants any meaningful retirement benefits. Indeed, accounting for inflation, participants investing in these options actually lost money. Accordingly, a prudent and loyal fiduciary would have removed these options and instead offered a stable value fund, which would have provided significantly higher returns while still offering protection of principal.

79. Hueler Analytics is the industry standard for returns of stable value funds. "The Hueler Analytics Stable Value Pooled Fund Universe includes data on 15 funds

39

nationwide with assets totaling over $105 billion." See http://hueler.com (last visited Oct. 8, 2015). Thus, the Hueler data represents a reasonable estimate of the returns of a typical stable value fund. The returns of the funds in the Hueler universe on average have far exceeded the returns of the Federated Treasury Obligations Fund (TOIXX) and the BB&T Bank Investment Contract in the Plan:

| Year | TOIXX return | BIC return | Hueler return |
| --- | --- | --- | --- |
| 2009 | 10 bps | 140 bps | 312 bps |
| 2010 | 2 bps | 77 bps | 312 bps |
| 2011 | 1 bp | 77 bps | 269 bps |
| 2012 | 1 bp | 67 bps | 226 bps |
| 2013 | 1 bp | 64 bps | 184 bps |
| 2014 | 1 bp | 62 bps | 169 bps |

80.    Hueler returns dating back three years, five years, ten years, fifteen years, and twenty years reflect similar disparities between money market funds and stable value funds.

81.    In light of stable value funds' clear advantages and enhanced returns compared to other fixed income options, when deciding which fixed income investment options to include in a 401(k) plan, a prudent fiduciary would consider using a stable value fund.

82.    For a number of years, Plan fiduciaries failed to adequately investigate the possibility of including a stable value fund, and declined to include a stable value option in the Plan without any prudent or loyal reason to do so.

40

83. Moreover, given that the Federated Treasury Obligations Fund and BB&T Bank Investment Contract had multiple consecutive years of minimal returns and clearly were not generating any meaningful retirement benefits for participants, a prudent and loyal fiduciary monitoring the Plan's investments on an ongoing basis would have removed these funds, particularly once the Plan began offering a stable value fund.

84. By failing to offer a stable value fund and retaining the other fixed income funds, Defendants caused tens of millions of dollars in losses to the Plan.

**Defendants used a "unitized" structure for the BB&T Common Stock Fund and managed it in a way that caused substantial losses compared to BB&T stock**

85. The Plan's largest investment option is the BB&T Common Stock Fund, at over $600 million in assets. Instead of allowing participants to invest directly in shares of BB&T Corporation common stock (traded on the New York Stock Exchange as BBT), Defendants provided participants units in an account that included BB&T stock and cash. The cash portion was invested without bids in the Sterling Capital Prime Money Market Fund—yet another proprietary fund—which charged 51 basis points in annual fees, a greatly excessive fee for managing a money market fund. Money market funds charge far less in management fees for what is essentially managing cash. As noted in the chart at paragraph 59, Vanguard's Prime Money Market Fund charges only 14 basis points. Any additional fees charged to "manage" the stock fund as a whole were excessive because a single stock does not require investment management. The BB&T entity involved in "managing" the stock fund also had a clear conflict of interest and incentive to increase

41

the stock fund's cash levels in order to generate additional revenue to BB&T and Sterling Capital through the fees charged in the high-cost proprietary money market fund.

86.    The BB&T Common Stock Fund's cash holdings, excessive fees, conflicts of interest, and mismanagement had the effect of diluting the returns that participants received compared to the returns of BB&T stock available to any investor outside of the Plan. As of June 30, 2015, the most recent date for which performance information was available, the BB&T Common Stock Fund trailed the performance of BB&T stock over one, five, and ten-year periods. Thus, BB&T employees received lower returns than any investor walking in off the street who invested in BB&T stock. The lower returns caused by a unitized stock fund's cash holdings is described as "cash drag" or "investment drag." *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 793 (7th Cir. 2011).

87.    The use of a unitized structure can also encourage frequent trading, with the associated transaction costs further reducing the fund's returns. The reduction in returns caused by high transaction costs in a unitized fund is known as "transactional drag." *Id*. at 793–94.

88.    Moreover, even though with unitization the cash holdings should result in outperformance during periods when the stock declines in value, the opposite occurred with the BB&T Common Stock Fund. As of March 31, 2015, BB&T stock was down by 0.4% over a one-year period. The BB&T Common Stock Fund performed worse than the underlying stock, losing 1.07% over the same period. Accordingly, any purported benefit

42

from the fund's cash holdings was entirely negated by the excessive fees, mismanagement, conflicts of interest, and excessive cash held in the fund.

89. There are a number of ways in which Defendants could have reduced or eliminated the underperformance of the BB&T Common Stock Fund compared to BB&T stock, that other companies offering company stock in their 401(k) plans frequently use:

a. Instead of a "unitized" structure that gave participants a mix of stock and cash, Defendants could have used a share accounting structure, which would have allowed participants to own shares of BB&T stock directly. This would have eliminated the "cash drag" and "transactional drag" and provided participants in the Plan the same undiluted returns of BB&T stock available to any investor on the street.

b. Using a three-day settlement period for participants who sell their shares, which is the standard period for every brokerage account, and would eliminate the need to hold cash.

c. While Defendants told participants that unitization allows the Plan "to trade BB&T stock without the normal three-day settlement period," suggesting unitization is the only means to avoid three-day settlement, if that were the goal, that statement is not true. Defendants could have arranged for participants desiring the quicker

43

settlement in a direct ownership system to do so by essentially

paying for a two-day loan for that service.

d.     Diligently monitoring the fund's cash needs and limiting the cash

holdings so as to minimize cash drag.

e.     Imposing trading restrictions so as to reduce the need for cash and to

reduce transaction costs generated by frequent trading.

f.     Investing the fund's cash holdings in an option with lower fees than

the 51 basis point Sterling Capital money market fund.

90.     ERISA requires fiduciaries to perform a cost-benefit analysis of potential

solutions to cash drag and transactional drag in a unitized stock fund. See *George*, 641

F.3d at 795. Defendants selected and maintained the unitized structure for the BB&T

Common Stock Fund without engaging in a reasoned decision-making process to

determine whether the diminished returns caused by the fees and cash holdings

outweighed any purported benefits of unitization, and without adequately considering

whether the use of an alternative structure would better serve the interests of participants.

91.     As a result of Defendants' use of a unitized structure and allowing the fund

to hold excessive cash and fees while failing to adequately investigate potential

alternatives, the Plan suffered millions of dollars of losses compared to the undiluted

performance of BB&T Corporation common stock.

44

**Defendants concealed their fiduciary breaches**

92. Defendants concealed their breaches of fiduciary duty and prohibited transactions through a series of false and misleading statements and by omitting disclosure of material information, thereby preventing Plaintiffs from discovering Defendants' breaches and violations.

93. Defendants falsely told participants that they engaged in "*[o]versight of plan fees . . . The fees charged for the investments and for administering your plan are evaluated regularly to make sure they are reasonable*" (emphasis added). This and other similar statements concealed the facts that Defendants:

    a. failed to assess the reasonableness of the Plan's investment management and administrative fees;

    b. retained high-cost proprietary BB&T and Sterling Capital mutual funds for the purpose of benefiting BB&T and driving revenues to BB&T and its subsidiaries;

    c. failed to prudently consider alternative options with lower fees;

    d. failed to obtain bids for recordkeeping;

    e. mismanaged the BB&T Common Stock Fund by holding excessive cash in it, charged excessive fees for "managing" the fund and managing the cash in it, and had a conflict of interest by using a proprietary entity to "manage" the cash held.

94.     Defendants also falsely represented that "*[t]he Plan Sponsor* [BB&T Corporation] *pays the administrative fees for the Plan*" (emphasis added). In account statements sent to participants, Defendants informed participants that recordkeeping fees were paid by BB&T and "not charged to your account," and that "[n]o administrative fees were deducted from your account this quarter." These false and misleading statements and other similar statements caused participants to believe that they paid no administrative fees and that BB&T generously paid the expenses, concealing the facts that BB&T actually *received* millions of dollars in excessive administrative fees annually, which were paid by participants from their mutual fund investments.

95.     As to the BB&T Common Stock Fund, in guides distributed to participants, Defendants stated that their use of a unitized fund structure had "*a significant advantage: we are able to trade BB&T stock without the normal three-day settlement period*." (emphasis added). This misleading statement concealed the fact that the unitized structure as managed by BB&T had a very significant *disadvantage*—that it caused the fund to underperform BB&T stock. Defendants' statement also suggested that unitization was the only way to trade BB&T stock without a three-day settlement period, which is false. Defendants could have provided one-day settlement to participants who desired and were willing to pay the costs for it.

96.     Defendants further misrepresented the vehicle in which the fund's cash holdings is invested. The summary plan description currently available on BB&T's

46

website states that the fund's cash balance is invested in the Sterling Capital Prime Money Market Fund. However, that fund was liquidated in December 2012.

97.     Defendants further concealed the underperformance of the BB&T Common Stock Fund by reporting only the return of the fund without a comparison to the return of BB&T stock. Instead of using the stock return as the benchmark, Defendants used the S&P 500 index, which concealed the underperformance of the BB&T Common Stock Fund compared to BB&T stock.

98.     Defendants also informed participants that they could "approximate" the number of BB&T shares owned by dividing the value of the account by the price of BB&T stock. This concealed the fact that participants would have owned significantly *more* shares if the fund had not been unitized.

**Defendants also concealed other information they are required to provide**

99.     Approximately three-and-a-half months ago, on June 22, 2015, Plaintiff Kirouac through undersigned counsel requested from the Plan administrator certain Plan-related documents under 29 U.S.C. §1024(b)(4) and 29 C.F.R. §2550.404c-1. On July 21, 2015, the Administrator—identified by counsel as "BB&T"—responded by providing limited documents, but withheld a number of other requested documents required to be produced under 29 U.S.C. §1024(b)(4), and are thus liable for penalties of up to $110 per day under 29 U.S.C. §1132(c) and 29 C.F.R. §2575.502c-1.

100.    Among the materials that BB&T withheld was the Plan's Investment Policy Statement, or IPS, even though controlling authority requires a plan administrator to

47

disclose an IPS that is incorporated into a plan document, as it is here under Plan §§8.14 and 10.1.5(b). *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 656 (4th Cir. 1996). Other withheld materials included expense disclosures from the Plan's recordkeeper, the recordkeeping contract, and other fee-related information that would have disclosed important facts about Defendants' fiduciary breaches, such as the amounts of revenue sharing payments and any consultant reports regarding the Plan's fees. By withholding that information, Defendants continued their campaign of concealment.

## ERISA'S FIDUCIARY STANDARDS AND PROHIBITED TRANSACTIONS

101. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of
>
> > (i) providing benefits to participants and their beneficiaries; and
> > (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

102. Under 29 U.S.C. 1103(c)(1), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

48

103.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan. "[A] fiduciary of a defined contribution, participant-driven, 401(k) plan created to provide retirement income for employees who is given discretion to select and maintain specific investment options for participants—must exercise prudence in selecting and retaining available investment options." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007). In determining whether a fiduciary has selected investments prudently, courts "examine the totality of the circumstances[.]" *Id.*

104.    ERISA fiduciaries selecting plan investments and service providers "must also scrupulously adhere to a duty of loyalty, and make any decisions in a fiduciary capacity with 'an eye single to the interests of the participants and beneficiaries.'" *Id.* at 418–19. "Corporate officers must 'avoid placing themselves in a position where their acts [or interests] as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan.'" *Id.* at 419 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)).

105.    ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

Case 1:15-cv-00841-CCE-JEP    Document 1    Filed 10/08/15    Page 49 of 78

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)     if he participants knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

106.     The general duties of loyalty and prudence imposed by 29 U.S.C. §1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. §1106, and are considered "*per se*" violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

[A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

(A)     sale or exchange, or leasing, of any property between the plan and a party in interest;

* * *

(C)     furnishing of goods, services, or facilities between the plan and party in interest;

(D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…

Section 1106(b) provides, in pertinent part, that:

[A] fiduciary with respect to the plan shall not –

50

(1)     deal with the assets of the plan in his own interest or for his own account,

(2)     in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or

(3)     receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

107.     29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

108.     29 U.S.C. §1132(a)(3) provides a cause of action against a non-fiduciary "party in interest" who knowingly participates in prohibited transactions or knowingly receives payments made in breach of a fiduciary's duty, and authorizes "appropriate equitable relief" such as restitution or disgorgement to recover ill-gotten proceeds from the non-fiduciary.

**CLASS ACTION ALLEGATIONS**

109.     29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to recover for the Plan the remedies provided by 29 U.S.C. § 1109(a).

110.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. In light of Defendants' concealment of their misconduct, Defendants' fiduciary breaches and other ERISA violations went undetected for years, and Plaintiffs are entitled to recover for the harm sustained during the time the breaches were concealed. While Defendants' long campaign of self-interested and imprudent conduct in managing the Plan likely began even earlier, Plaintiffs seek a starting date for the class of January 1, 2007, the date of the previous Plan restatement. Plaintiffs seek to certify the following class, and to be appointed as representatives of the class:

> All participants and beneficiaries of the BB&T Corporation 401(k) Savings Plan from January 1, 2007 through the date of judgment, excluding the Defendants.

111.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.    The Class includes over 30,000 members and is so large that joinder of all its members is impracticable.

b.    There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of

52

law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what are the profits of any breaching fiduciary that were made through the use of Plan assets by the fiduciary.

c.      Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.      Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for

53

the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

112. A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

113. Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a. Schlichter, Bogard & Denton has been appointed as class counsel in 15 other ERISA class actions regarding excessive fees in large 401(k) plans. As a district court in one of those cases recently observed: "the firm of

54

Schlichter, Bogard & Denton ha[s] demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at 4–5 (S.D. Ill. July 17, 2015). Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" of 401(k) fee litigation "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S. Dist. LEXIS 166816, at 8 (N.D. Ill. June 26, 2012). "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S. Dist. LEXIS 184622, at 8 (C.D. Ill. Oct. 15, 2013).

b.  Schlichter, Bogard & Denton handled the only full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428, at 10 (W.D. Mo. Nov. 2, 2012).

c.  Schlichter, Bogard & Denton is also class counsel in *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015), in which the Supreme Court held in a

55

unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect 401(k) plans generally.

d.  Schlichter, Bogard & Denton has obtained class-wide settlements in a number of ERISA fiduciary breach cases, obtaining both significant monetary and non-monetary relief for the benefit of hundreds of thousands of 401(k) plan participants. *Abbott v. Lockheed Martin Corp.,* No. 06-701 (S.D. Ill.); *Spano v. Boeing Co.*, No. 06-743 (S.D. Ill.); *Krueger v. Ameriprise Financial, Inc*., No. 11-2781 (D. Minn.); *Kanawi. v. Bechtel Corp.,* No. 06-5566 (N.D. Cal.); *Beesley v. Int'l Paper Co*., No. 06-703 (S.D. Ill.); *Will* v. *General Dynamics Corp.*, No. 06-698 (S.D. Ill.); *Nolte v. Cigna Corp.,* No. 07-2046 (C.D. Ill); *George v. Kraft Foods Global, Inc.,* No. 07-1713 (N.D. Ill.); *George v. Kraft Foods Global, Inc.,* No. 08-3799 (N.D. Ill.) *Martin v. Caterpillar, Inc.,* No. 07-1009 (C.D. Ill.).

e.  The firm's work in ERISA excessive fee class actions has been covered by the New York Times and Wall Street Journal, among other media outlets. See, e.g., Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014), available at

56

http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html; Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015), available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

f.   Schlichter, Bogard & Denton has agreed to advance the costs of this action contingent upon the outcome, and is aware that no fee can be awarded without the Court's approval.

## COUNT I

**Breach of Duties of Loyalty and Prudence—Excessive Administrative Fees**

114.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

115.   This Count alleges breach of fiduciary duties against BB&T Corporation, BB&T's Board of Directors, the Board's Compensation Committee, the Employee Benefits Plan Committee, and the individual directors and committee members.

116.   As alleged above, each of these Defendants were fiduciaries under 29 U.S.C. §§1002(21) or 1102(a)(1).

117.   The scope of the fiduciary duties and responsibilities of these Defendants includes discharging their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries and defraying reasonable expenses of administering the plan, and acting with the care, skill,

57

prudence, and diligence required by ERISA. These Defendants are directly responsible for ensuring that the Plan's fees are reasonable for the services provided.

118.   If a 401(k) plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. See *George*, 641 F.3d at 798–99. Similarly, "us[ing] revenue sharing to benefit [the plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and control recordkeeping fees" and "paying excessive revenue sharing" is a breach of fiduciary duties. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

119.   These Defendants failed to engage in a prudent and loyal process for selecting a Plan recordkeeper. Instead of soliciting competitive bids from outside vendors on a flat per-participant basis or soliciting bids at all, Defendants used BB&T Corporation or its subsidiary Branch Banking and Trust Company to provide these services. This not only benefited BB&T or its subsidiary by allowing those entities to receive millions of dollars in unreasonable compensation and profits without bids, but also caused Plan participants millions of dollars of losses. This conduct was a breach of the duties of loyalty and prudence.

120.   These Defendants failed to engage in a prudent and loyal process to ensure that the compensation paid to BB&T or its subsidiary was reasonable for the administrative services provided to the Plan. Defendants allowed BB&T to receive uncapped, asset-based revenue sharing, yet failed to monitor the amount of those payments to determine if they were reasonable. As the assets in the Plan grew, the

58

revenue sharing payments to BB&T or its subsidiary grew by a similar percentage, even though the services provided by BB&T or its subsidiary remained the same. This caused the recordkeeping compensation paid to BB&T or its subsidiary to become even more excessive than it had been. Through these actions and omissions, Defendants benefited themselves and BB&T Corporation and its subsidiary at the expense of participants. This conduct was a breach of the duties of loyalty and prudence.

121.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and is subject to other equitable or remedial relief as appropriate. Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II

### Breach of Duties of Loyalty and Prudence— Excessive Investment Management Fees and Performance Losses

122.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

123.    This Count alleges breach of fiduciary duties against BB&T Corporation,

BB&T's Board of Directors, the Board's Compensation Committee, the Employee

Benefits Plan Committee, and the individual directors and committee members.

124.    The scope of the fiduciary duties and responsibilities of these Defendants

includes managing the assets of the Plan for the sole and exclusive benefit of Plan

participants and beneficiaries, defraying reasonable expenses of administering the plan,

and acting with the care, skill, diligence, and prudence required by ERISA. These

Defendants are directly responsible for ensuring that the Plan's fees are reasonable,

selecting prudent investment options, evaluating and monitoring the Plan's investments

on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to

ensure that the Plan's assets were invested prudently.

125.    As the Supreme Court recently confirmed, ERISA's "duty of prudence

involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*,

135 S. Ct. at 1829.

126.    These Defendants selected and retained as Plan investment options mutual

funds with high expenses and poor performance relative to other investment options that

were readily available to the Plan at all relevant times. This included the use of both

proprietary and non-proprietary mutual funds with expense ratios far in excess of other

options available to the Plan, including separate accounts, collective trusts, lower-cost

mutual funds, and lower-cost share classes with the identical investment manager and

investments, and retaining the proprietary BB&T and Sterling Capital funds despite

60

sustained poor performance. In so doing, Defendants failed to make Plan investment decisions based solely on the merits of the investment funds and what was in the interest of participants, and instead made investment decisions that would drive revenues and profits to BB&T Corporation and its subsidiaries. Defendants therefore failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, and instead acted for the purpose of benefiting BB&T Corporation and its subsidiaries, in breach of their fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A).

127.   These Defendants selected and retained as Plan investment options mutual funds with poor performance histories and high expenses relative to other investment options that were readily available to the Plan at all relevant times, including separate accounts, collective trusts, lower-cost mutual funds, and lower-cost share classes with the identical investment manager and investments. In failing to adequately consider lower cost or better-performing investments for the Plan, Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. Defendants therefore breached their duties under 29 U.S.C. §1104(a)(1)(B).

128.   Defendants failed to engage in a prudent process for the selection and retention of Plan investment options. Instead, Defendants used more expensive funds

with inferior performance that paid revenue sharing and generated investment management fee revenues for BB&T Corporation and its subsidiaries and ultimately benefited BB&T entities rather than the Plan. A prudent investigation not tainted by self-interest would have revealed to a reasonably prudent fiduciary that the BB&T and Sterling Capital mutual funds and the other excessive-cost mutual funds in the Plan were inferior to other options available to the Plan, which had much lower costs and better performance. Had a prudent and loyal fiduciary conducted such an investigation, it would have concluded that the Plan's investment options were selected and retained for reasons other than the best interest of the Plan and its participants and were causing the Plan to waste tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plan.

129. Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and is subject to other equitable or remedial relief as appropriate. Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and

thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT III

### Breach of Duties of Loyalty and Prudence—
### Use of Short-Term Fixed Income Options Instead of Stable Value Fund

130. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

131. This Count alleges breach of fiduciary duties against BB&T Corporation, BB&T's Board of Directors, the Board's Compensation Committee, the Employee Benefits Plan Committee, and the individual directors and committee members.

132. The scope of the fiduciary duties and responsibilities of these Defendants includes direct responsibility for evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and ensuring that the Plan offers prudent investment options that will provide meaningful financial benefits to participants.

133. These Defendants maintained as Plan investment options the BB&T Corporation One-Year Bank Investment Account, which invested in a business savings account, and the Federated Investors Treasury Obligations Fund, a money market fund. Both of these funds hold very short-term instruments and for many consecutive years have generated only minimal returns that did not keep pace with inflation, and thus did not provide any meaningful retirement benefits to participants. Prudent fiduciaries know that such minimally returning funds will not and have not kept pace with inflation. These

63

Defendants failed to make a reasoned decision as to whether it would be in participants' interest to instead offer a stable value fund, which invests in longer-term instruments and thus would have provided significantly higher returns than the BB&T and Federated funds without a material increase in risk. Once the Plan finally began offering a stable value fund, these Defendants continued to retain the BB&T and Federated funds, even though Defendants knew that the funds had failed to keep pace with inflation for years and were not providing any meaningful retirement benefit. A prudent and loyal fiduciary monitoring the Plan's investments on an ongoing basis would have removed the BB&T and Federated funds years ago. Maintaining these funds in the Plan while failing to offer a stable value fund caused the Plan millions of dollars in losses compared to what the assets in those funds would have earned if invested in a stable value fund, while generating revenues for BB&T. This conduct was a breach of the duties of loyalty and prudence.

134.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and is subject to other equitable or remedial relief as appropriate. Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and

thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under

29 U.S.C. §1105(a).

## COUNT IV

### Breach of Duties of Loyalty and Prudence—BB&T Common Stock Fund

135.    Plaintiffs restate and incorporate the allegations contained in the preceding

paragraphs as though fully set forth here.

136.    This Count alleges breach of fiduciary duties against BB&T Corporation,

BB&T's Board of Directors, the Board's Compensation Committee, the Employee

Benefits Plan Committee, and the individual directors and committee members.

137.    The scope of the fiduciary duties and responsibilities of these Defendants

includes employing appropriate methods to determine whether the Plan's investments are

structured prudently and in a manner that serves the exclusive purpose of providing

benefits to participants, evaluating and monitoring the Plan's investments on an ongoing

basis and eliminating imprudent ones, and ensuring that the Plan's fees are reasonable.

138.    When 401(k) plan participants suffer losses from "cash drag" and excessive

fees in a unitized stock fund, ERISA fiduciaries must perform a cost-benefit analysis of

potential solutions—to "actually determine[] whether the costs of making changes to the

CSFs outweigh[] the benefits, or vice versa." *George*, 641 F.3d at 795. A fiduciary's

failure "to balance the relevant factors and make a reasoned decision as to the preferred

course of action—under circumstances in which a prudent fiduciary would have done so

65

is a breach of the prudent man standard of care." *Id*. at 796 (citing *DiFelice*, 497 F.3d at 420-21).

139.    These Defendants used a unitized structure for the BB&T Common Stock Fund, investing a portion of the fund's assets in a proprietary money market fund that allowed BB&T Corporation and its subsidiary Sterling Capital to collect additional revenues. Mismanagement of the fund due to the fund's cash holdings, fees, and conflicts of interest caused the Plan millions of dollars in losses compared to BB&T stock without cash. There were a number of alternatives available to Defendants that other companies offering company stock in their 401(k) plans use that would have reduced or eliminated the difference in performance. Defendants could have used a share accounting structure, with a three-day settlement period as is standard in all brokerage accounts, which would have allowed participants to own shares of BB&T stock directly and to obtain the full return of the stock, instead of units of stock and cash which provided diluted returns. If participants trading shares desired one-day settlement of their trades instead of the customary three-day settlement period, Defendants could have arranged for participants desiring the quicker settlement to obtain it through a share accounting structure and pay the additional cost for that quicker settlement directly. Other options to reduce the underperformance of the stock fund compared to BB&T stock included monitoring the fund's cash needs and limiting the cash holdings, imposing trading restrictions so as to reduce the need for cash and to reduce transaction costs generated by frequent trading, or selecting a lower-fee option for the vehicle in which the cash was invested. Defendants

66

selected and maintained the unitized structure without engaging in a reasoned decision-making process to determine whether the purported benefits of unitization outweighed the harm to participants from the unitized structure, and without adequately considering whether to implement measures to reduce the harm caused by excessive fees and cash holdings. Defendants also mismanaged the BB&T Common Stock Fund by allowing it to hold excessive amounts of cash and to be assessed excessive fees, and created a conflict of interest for the BB&T entity that determined the amount of cash to hold in the fund. This conduct was a breach of the duties of loyalty and prudence. As a result of Defendants' breaches of fiduciary duty, the Plan suffered millions of dollars of losses.

140.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and is subject to other equitable or remedial relief as appropriate. Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT V

## Failure to Monitor Fiduciaries

141.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

142.    This Count alleges breach of fiduciary duties against the Board of Directors of BB&T Corporation, and the individual directors.

143.    As alleged above, these Defendants are fiduciaries under 29 U.S.C. §1002(21), and are thus bound by the duties of loyalty and prudence.

144.    The Board of Directors of BB&T Corporation is a named fiduciary under Plan §10.1.1 responsible for appointing and removing members of the Employee Benefits Plan Committee, and appointing and removing trustees. Also, the Plan's financial statements filed with the United States Departments of Labor and Treasury and the Securities and Exchange Commission state that the Board of Directors is "responsible for the oversight of the Plan," and that "certain of the Board's responsibilities have been delegated to the Employee Benefits Plan Committee."

145.    Given that the Board of Directors had overall oversight responsibility for the Plan, and the explicit fiduciary responsibility to appoint and remove members of the Employee Benefits Plan Committee, the Defendant Board of Directors and its individual members had a fiduciary responsibility to monitor the performance of the other fiduciaries, including the Compensation Committee and the Employee Benefits Plan Committee.

146.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

147.    To the extent any of the Board of Directors' fiduciary responsibilities were delegated to the Employee Benefits Plan Committee or another fiduciary, the Board's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

148.    The Board of Directors of BB&T Corporation and the individual directors breached their fiduciary monitoring duties by, among other things:

a.    failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

b.    failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the widespread use of proprietary funds from which BB&T Corporation and its subsidiaries received profits in violation of ERISA;

c.    failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount

69

of all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments; a process to prevent the recordkeeper from receiving uncapped revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

d.     failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's BB&T and Sterling Capital funds and other high-cost mutual fund options;

e.     failing to ensure that the monitored fiduciaries had a prudent process in place for managing the BB&T Common Stock Fund, including a process to determine a prudent structure for the fund; a process to monitor and control the fund's cash levels, cash drag, fees, conflicts of interest, and performance compared to BB&T stock; and a process for evaluating the potential solutions to the fund's underperformance compared to BB&T stock to prevent further losses to the Plan; and

f.     failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, and options that did not even keep up with inflation, all to the detriment of Plan participants' retirement savings.

70

149. As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had the Board of Directors and its individual member Defendants discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, and the Plaintiffs and the other Class members, lost tens of millions of dollars of retirement savings.

150. Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and is subject to other equitable or remedial relief as appropriate. Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT VI

### 29 U.S.C. §1106(a)—Prohibited Transactions between plan and party in interest

151. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

71

152. This Count alleges prohibited transactions against BB&T Corporation, the Board of Directors, the Board's Compensation Committee, the Employee Benefits Plan Committee, and the individual directors and committee members.

153. These Defendants caused the Plan to use BB&T and Sterling Capital mutual funds as investment options and to use BB&T Corporation or its subsidiary Branch Banking and Trust Company as the Plan's trustee and recordkeeper.

154. BB&T Corporation, Sterling Capital Management LLC, and Branch Banking and Trust Company are all parties in interest because they are entities providing services to the Plan and their employees are covered by the Plan.

155. Accordingly, by causing the Plan to use BB&T funds and services, these Defendants caused the Plan to engage in transactions constituting an exchange of property between the Plan and a party in interest, a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation, and a transfer to or use by or for the benefit of a party in interest, assets of the Plan.

156. Under 29 U.S.C. §1109(a), these Defendants are liable to restore all losses suffered by the Plans as a result of these prohibited transactions and to disgorge all revenues received by BB&T Corporation and its subsidiaries from the fees paid by the Plan to BB&T Corporation and its subsidiaries as well as other appropriate equitable or remedial relief.

**29 U.S.C. §1106(b)—Prohibited Transactions between plan and fiduciary**

157.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

158.   BB&T Corporation, the Board of Directors, the Board's Compensation Committee, and the individual directors and Compensation Committee members violated 29 U.S.C. §1106(b) as follows:

   a.   In causing the Plan to use proprietary BB&T and Sterling Capital investment options and BB&T Corporation or its wholly-owned subsidiary Branch Banking and Trust Company as the Plan's trustee and recordkeeper, these Defendants dealt with the assets of the plan in their own interest or for their own account, in violation of 29 U.S.C. §1106(b)(1).

   b.   In causing the Plan to use proprietary BB&T funds and services, these Defendants acted in a transaction involving the Plan on behalf of BB&T Corporation or its wholly-owned subsidiaries Sterling Capital Management LLC and Branch Banking and Trust Company, parties whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in violation of 29 U.S.C. §1106(b)(2).

159.   By receiving revenue sharing from the Plan's mutual funds, BB&T Corporation or Branch Banking and Trust Company received consideration for their own

personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

160.    By receiving fees from the BB&T and Sterling Capital mutual funds in the Plan, including the proprietary money market fund in the BB&T Common Stock Fund, BB&T Corporation and Sterling Capital Management LLC received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

161.    For the reasons discussed above, the Defendants referenced in this Count were fiduciaries and parties in interest with respect to the Plan.

162.    As a direct result of these prohibited transactions, the Plan, directly or indirectly, paid millions of dollars in investment management and administrative fees that were prohibited by ERISA and suffered millions of dollars in losses.

163.    Under 29 U.S.C. §1109(a), these Defendants are liable to restore all losses suffered by the Plans as a result of the prohibited transactions and to disgorge all revenues received by BB&T Corporation and its subsidiaries from the fees paid by the Plan to BB&T Corporation and its subsidiaries, as well as other appropriate equitable or remedial relief.

## COUNT VIII

### 29 U.S.C. §1132(a)(3)—equitable relief from non-fiduciaries

164.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

74

165. Pleading alternatively, to the extent any of the Plan's service providers (Sterling Capital Management LLC and Branch Banking and Trust Company or BB&T Corporation in its capacity as trustee and recordkeeper) are deemed not to be a fiduciary, they are subject to "other appropriate equitable relief" under 29 U.S.C. §1132(a)(3) to redress "any act or practice" that violates ERISA. A nonfiduciary transferee of ill-gotten proceeds is liable if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

166. Each of these Defendants knew or should have known that the act or practice of using proprietary BB&T funds and services in the Plan allowed BB&T Corporation and its subsidiaries to benefit financially through excessive fees paid by the Plan and at the expense of the Plan's participants.

167. Each of these Defendants knew or should have known that the act or practice of using proprietary BB&T funds and services in the Plan constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation or a transfer of assets of the Plan to a party in interest.

168. Each of these Defendants knew or should have known that the act or practice of using proprietary BB&T funds and services in the Plan constituted transactions in which Plan fiduciaries dealt with the assets of the plan in their own interest or for their own account, transactions involving the Plan on behalf of parties whose interests were adverse to the interests of the Plan, its participants and beneficiaries, or transactions in which a Plan fiduciary received consideration for its own personal

75

account from parties dealing with the Plan in connection with transactions involving the assets of the Plan.

169.    Because each of these Defendants is an employer whose employees are covered by the Plan, each of these Defendants knew or should have known that the act or practice of using proprietary BB&T funds and services in the Plan resulted in the assets of the Plan inuring to the benefit of an employer, in violation of 29 U.S.C. §1103(c)(1).

170.    Accordingly, each of these Defendants participated in the prohibited transactions described above, knowingly received excessive fees paid from Plan assets, and knowingly allowed assets of the Plan to inure to their benefit.

171.    Therefore, to the extent any ill-gotten proceeds and profits are not disgorged under the fiduciary relief provisions of 29 U.S.C. §1109(a), the Court should order restitution or disgorgement as appropriate equitable relief under 29 U.S.C. §1132(a)(3) to restore these monies to the Plan.

## JURY TRIAL DEMANDED

172.    Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that the Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties or prohibited transaction, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which plan losses and fiduciary profits under 29 U.S.C. §1109(a) should be calculated and order Defendants to provide all accountings necessary to determine the amounts Defendants must make good the the Plan under §1109(a);

- find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions and cause the Defendants to disgorge such monies and return them to the Plan;

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- order equitable restitution against the Defendants;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

PLAINTIFFS DEMAND TRIAL BY JURY

October 8, 2015                                Respectfully submitted,

/s/ David B. Puryear, Jr.
David B. Puryear, Jr.
NC State Bar No. 11063
PURYEAR & LINGLE, PLLC
5501-E Adams Farm Lane
Greensboro, NC 27407
(336) 218-0227
puryear@puryearandlingle.com

SCHLICHTER, BOGARD & DENTON LLP
Jerome J. Schlichter*
Michael A. Wolff*
Troy A. Doles*
Heather Lea*
Sean E. Soyars*
      *appearing by special appearance
100 South Fourth Street
St. Louis, Missouri 63102
(314) 621-6115
jschlichter@uselaws.com
mwolff@uselaws.com
tdoles@uselaws.com
hlea@uselaws.com
ssoyars@uselaws.com

Attorneys for Plaintiffs

78